UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

REBECCA M. PEPPERINE,

              Plaintiff,

v.

MOHAWK VALLEY COMMUNITY COLLEGE,

              Defendant.

6:25-cv-176 (GTS/TWD)

## COMPLAINT

Case No. 25-CV-

ECF Case

COMES NOW PLAINTIFF REBECCA M. PEPPERINE, by her undersigned attorney, for her Complaint against Defendant Mohawk Valley Community College and alleging as follows:

### NATURE OF THE ACTION

1. Defendant Mohawk Valley Community College discriminates against female employees and retaliates against women who complain about the discrimination. Plaintiff Rebecca Pepperine was an outstanding employee who worked in MVCC's career services and also taught evening classes as an adjunct faculty member. But when she complained to the college about her new supervisor's persistent discriminatory behavior, she was fired. As the EEOC determined, this is a clear cut case of unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff asserts a concurrent claim under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* By this action, Plaintiff seeks all available legal and equitable relief, including back pay, front pay, reinstatement, out of pocket costs, compensatory damages, punitive damages, civil penalties, and attorney's fees and costs. Plaintiff demands trial by jury.

1

## PARTIES

2. Plaintiff **Rebecca M. Pepperine ("Pepperine")** is an adult resident of Utica, New York.

3. Defendant **Mohawk Valley Community College ("MVCC")** is a community college in Oneida County, New York, with an address of 1101 Sherman Drive, Utica, New York, 13501.

4. At all relevant times, MVCC had more than 500 employees.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

6. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367, because Plaintiff's federal and state law claims derive from a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution

7. This Court has venue over this action pursuant to 28 U.S.C. §§ 1391(b)(1) and/or (b)(2), because Defendant resides in this judicial district and/or a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

8. This Court also has venue over this action pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII), because this is the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice.

## ADMINISTRATIVE PROCEEDINGS

9. On or about March 15, 2018, Plaintiff filed a charge of discrimination against MVCC with the U.S. Equal Employment Opportunity Commission

("EEOC"), alleging claims of sex discrimination and retaliation relating to incidents that occurred between April 14, 2017, and November 30, 2017. The charge was assigned case number 525-2018-00163. *See* **Exhibit A**.

10. On or about March 28, 2018, Plaintiff filed another charge of discrimination against MVCC with the EEOC, alleging a claim of retaliation relating to her termination on or about March 22, 2018. The charge was assigned case number 525-2018-00715. *See* **Exhibit B**.

11. On October 13, 2023, the EEOC issued a Determination with respect to Charge No. 525-2018-00163. The EEOC determined there was reasonable cause to believe that MVCC had discriminated against Plaintiff. *See* **Exhibit C**.

12. On October 13, 2023, the EEOC issued a Determination with respect to Charge No. 525-2018-00715. The EEOC determined there was reasonable cause to believe that MVCC had discriminated against Plaintiff. *See* **Exhibit D**.

13. On November 15, 2024, the U.S. Department of Justice (to which agency the charges were assigned because they involve a government respondent) issued a Notice of Right to Sue Within 90 Days. *See* **Exhibit E**.

14. This action was filed within 90 days of Pepperine's receipt of the Notice of Right to Sue.

## **ALLEGATIONS**

15. Pepperine was employed by MVCC from on or about October 19, 2015, until June 30, 2018.

16. Her position was Career and Employer Relations Specialist. This was a grant funded appointment that was renewed in 2016 and 2017.

17. In addition to her full-time career services position, Pepperine was an adjunct faculty member who taught evening classes at MVCC (Utica campus), including Introduction to Sociology and Lifespan Development Psychology.

18. Pepperine taught Introduction to Sociology in Spring 2016, Summer 2016, Fall 2016, Spring 2017, Summer 2017, and Fall 2017. She taught Lifespan Development Psychology in Fall 2017 and Spring 2018.

19. At all relevant times, Pepperine was qualified for her position and performed her job duties in a satisfactory manner.

*A Tale Of Two Supervisors*

20. When she was hired, Pepperine reported to Janet Tamburrino, Director of Career & Transfer Services. Tamburrino reported to James Maio, Associate Dean for Student Development and Transition Services. Tamburrino retired in or around February 2017.

21. Pepperine enjoyed a positive, respectful, and supportive working relationship with Tamburrino.

22. During the approximately 15 months when Tamburrino was her supervisor, Pepperine thrived in her position. She received consistently positive and encouraging feedback from Tamburrino, as well as compliments and appreciation from her clients, colleagues, and students. During this period, Pepperine had very little interaction with Maio.

23. Tamburrino completed Pepperine's annual evaluation in April 2016. Tamburrino's comments about Pepperine's job performance included "accomplished excellent Career Fairs," "very successful in delivering classroom presentations," "great job learning the technology," "certainly demonstrating the skills and attitude

4

of a great team member," and "[t]he students have benefitted from her energy, talent, and enthusiasm." *See* **Exhibit F**.

24. During the time when Tamburrino was her supervisor, there were no complaints about Pepperine's job performance or workplace behavior. Unfortunately, this all changed for the worse when she started reporting to Maio in or around February 2017.

25. One of Maio's first actions as Pepperine's supervisor was completing her annual evaluation in April 2017. Although generally positive, the tone and content of the evaluation were starkly different from Pepperine's 2016 evaluation from Tamburrino. *See* **Exhibit G**.

26. Most troublingly, Maio leveled an unfounded personal attack on Pepperine's "communication style," which he described as "abrupt" and "abrasive," and advised her "to be sensitive to how her communication is received by others." *See* **Exhibit G**. These were blatantly sexist tropes that shocked and offended Pepperine.

27. Although at first she tried to ignore this personal attack, Pepperine contacted Maio and Human Resources about submitting a statement rebutting Maio's accusations to be added to her personnel file with the evaluation. Despite being given an administrative run-around, Pepperine emailed her rebuttal statement on or about May 17, 2017, in which she provided direct quotations from students, staff, administrators, and external agencies attesting to her helpfulness and professionalism. Upon information and belief, Pepperine's email was ignored and not placed in her personnel file.

28. By standing up for herself, Pepperine became marked for Maio's wrath and retaliation.

29. Instead of treating Pepperine with the respect she deserved and giving her space to continue doing the great job she had been doing under Tamburrino, Maio embarked on a campaign of micromanaging, criticizing, and deliberately provoking conflict with Pepperine, apparently with the aim of "breaking" her or forcing her out.

30. At all relevant times, Pepperine had a good faith, reasonable belief that Maio was mistreating her because she is a woman.

*Pepperine's October 18, 2017 Meeting With HR*

31. On October 18, 2017, Pepperine met with Kimberly Evans-Dame, Executive Director of Human Resources, to express her serious concerns, and seek help, regarding how she was being treated by Maio. Pepperine was feeling very anxious and worried about her job. Pepperine explained to Evans-Dame that she was being unfairly targeted, bullied, and harassed by Maio, which she told Evans-Dame was because she is a woman. Pepperine relayed to Evans-Dame that she had heard Maio has a reputation for targeting women, and that he was targeting her now. Specific incidents they discussed during this meeting were Pepperine's being called "abrasive" by Maio in her 2017 annual evaluation, Maio chastising her by email over edits he wanted made to a career services handout (unbeknownst to Pepperine, he had forwarded this email to HR), and a counseling memo Maio had given her on October 2, 2017.

32. The October 2 counseling memo was a perfect example of the tactics Maio used to attack and provoke Pepperine. The origin of the memo was a complaint that had been passed along to Maio on September 25, 2017, about Pepperine allegedly "not seem[ing] to interact with students very much" and "also seem[ing] somewhat negative" during a recent Club Day event. *See* **Exhibit H**.

Maio used this trivial issue to "ha[ve] a discussion" with Pepperine "about [her] behavior" during the event. When Pepperine denied the accusations, which were false, Maio called her "dismissive" and "unwilling to accept responsibility" and "verbally combative." He further criticized her for emailing the person who had conveyed the complaint (not the complainant herself) to explain the situation to him. At the end of the counseling memo, Maio told Pepperine that "your communication style can be abrasive and in this case can be more aptly described as combative." *See* **Exhibit I**. Clearly, Maio had a personal problem with an independent, outspoken woman like Pepperine.

33. After listening to Pepperine's concerns about Maio unfairly targeting and criticizing her, to Pepperine's dismay Evans-Dame defended Maio's actions and questioned Pepperine's perception of being discriminated against because she was female. Evans-Dame then lobbed additional criticisms at Pepperine. Pepperine was taken off guard and felt that Evans-Dame was trying to scare and intimidate her.

34. Evans-Dame stated that she had received a complaint about Pepperine from another Human Resources employee, Nancy Wallace, who a few minutes later joined the meeting and told Pepperine, in a stern and angry manner, that she was offended by where the HR table had been placed during a recent Career Fair. In addition to this petty complaint – which Pepperine said would be rectified at the next event – Wallace claimed that another HR employee (who no longer worked at the college) had been upset by something Pepperine allegedly said to her at another school event, which was equally petty and which Pepperine did not remember. After Wallace left the meeting, Evans-Dame then told Pepperine that one of her students – someone with whom Pepperine had great rapport – allegedly

7

had complained about Pepperine not allowing her to leave class early one time. This was the first that Pepperine had heard about any of these complaints.

37. Pepperine left her meeting with Evans-Dame feeling ambushed and ganged up on and more bullied than when she had arrived. She feared that Maio and HR were working together to build a case against her.

36. Evans-Dame emailed Pepperine on October 21, 2017, following up on their October 18 meeting. *See* **Exhibit J**.

37. Upon information and belief, which will be confirmed in discovery, Maio was informed about Pepperine's October 18 meeting with HR.

*Pepperine's Office Lighting Issue*

38. Maio did not wait long to retaliate against Pepperine for complaining about him to HR. Only a week later he started criticizing Peppering for occasionally lowering the lights in her new office to help ease eye strain she was suffering from the harsh fluorescent lighting. This was something that other employees also did. Although lowering her lights did not affect her work or anyone else's work, Maio ordered her to stop doing so; when he noticed she had lowered her lights on another occasion, he initiated disciplinary action against her.

39. On October 26, 2017, Maio emailed his supervisor, Stephanie Reynolds, Vice President of Student Affairs, about the office lighting issue. *See* **Exhibit K**. In his email, Maio noted that Pepperine had "accused [him] of harassment" over the issue and stated that he wanted "to move to formal discipline with this." Reynolds then emailed Evans-Dame in HR, asking for advice in dealing with this "escalating" situation. *Id.* In her email to Evans-Dame, Reynolds noted that she was "up to speed on the Rebecca Pepperine issue" – clearly indicating that a case in fact was being built against her – and that she was "concerned that

8

[Pepperine] has been stating that Jim is harassing her . . . when, in fact, he has been attempting to supervise." Instead of investigating whether Maio was managing the situation properly, however, Reynolds labeled Pepperine "insubordinate" and recommended issuing her a written warning. *Id*.

40. That same day, Reynolds emailed Pepperine, instructing her that "[l]ights will be on when staff are present" and advising her that "[i]f you are uncomfortable with that you may have a discussion with HR." *See* **Exhibit L**.

41. Shortly thereafter, Pepperine had a meeting with Evans-Dame in HR in which she explained why she occasionally needed to lower the lights in her office. Following the meeting, on November 5, 2017, Evans-Dame emailed George Aylesworth, Environmental Health and Safety Officer, about inspecting Pepperine's office and "the possibility of some options that would soften the harshness of the fluorescent lighting which is having an impact on a medical condition she has." *See* **Exhibit M**. Maio was cc'd on the email.

42. Aylesworth met with Pepperine and measured the lighting in her office on November 8, 2017. He reported his findings to Evans-Dame in an email on November 9, 2017. *See* **Exhibit M**. Aylesworth informed Evans-Dame that "[f]rom my observations and from my research it is very unlikely that a reduction in Rebecca's lighting requirements will have any effect on her co-workers['] lighting needs." He recommended "some remedies [that] could be used to assist her in battling her eye ailment," including placing different bulbs in the overhead fixtures and painting the walls in softer earth tones.

43. Despite HR acknowledging that Pepperine had a medical condition that required her to lower the lights in her office, and despite being informed by the Environmental Health and Safety Officer that the lighting in Pepperine's office

9

could be reduced without affecting her coworkers, on November 14, 2017, Maio proceeded to issue a formal notice of proposed discipline – an oral warning – to Pepperine over the issue. *See* **Exhibit N**. Rather than demonstrating Pepperine's alleged insubordination, this incident underscored Maio's personal animosity towards Pepperine.

44. For reasons that are not explained in the record, HR did not act on the notice of proposed discipline until December 20, 2017 [after Pepperine had filed her formal complaint about HR] when Evans-Dame approved the oral warning and issued the final disposition to Pepperine. *See* **Exhibit O**.

*Pepperine's Formal Complaint About HR*

45. Pepperine was upset by how she had been treated during her meeting with Evans-Dame on October 18, 2017, and she was concerned that HR was not handling the ongoing situation with Maio in an unbiased manner. She contacted MVCC President Randall VanWagoner to discuss her concerns, but he declined to meet with her and told her to proceed with the union.

46. On November 15, 2017, Pepperine submitted a formal complaint to the college about her treatment by HR. *See* **Exhibit P**.

47. Upon information and belief, which will be confirmed in discovery, Maio was informed about Pepperine's November 15 complaint.

48. Pepperine's November 15 complaint recounted her October 18 meeting with Evans-Dame, which she explained was prompted by her "serious concerns" about "feeling treated unfairly, bullied, harassed, targeted and threatened for my position by my supervisor James Maio." She stated that "[c]oworkers have warned me that Mr. Maio has a history of targeting, especially women who are strong and have a mind of their own, that he is a workplace bully and has attempted to drive

10

some out of their positions." She further stated that she had been warned that "he may take issue with me because I am not a subservient female." Pepperine noted that she "was able to do my job very well and function without difficulty until my previous supervisor retired late February 2017." *See* **Exhibit P**.

49. On November 16, 2017, President VanWagoner assigned Franca Armstrong, Associate Vice President of Workforce Development and Dean of the Rome Campus, to investigate the complaint.

50. For her investigation, Armstrong met separately with Pepperine, Evans-Dame, and Nancy Wallace, and questioned them about what had happened on October 18. It is not apparent from the record if Armstrong reviewed any written documentation as part of her investigation.

51. During her interview, Pepperine discussed many of her complaints about Maio, not just what had happened in HR on October 18, including her 2016 annual evaluation and the office lighting issue. There is no indication in the record that the college pursued further investigation into Pepperine's complaints against Maio at this time.

52. On or about December 19, 2017, Armstrong reported back to President VanWagoner with her findings and recommendations.

53. For reasons that are not explained in the record, the final decision on the complaint was not issued until January 9, 2018 [after Pepperine had filed her formal complaint about Maio] when Armstrong informed Pepperine by letter that "respondent(s) Kim Evans-Dame & Nancy Wallace have been found Not Responsible for Harassment." *See* **Exhibit Q**.

*Pepperine's Formal Complaint About Maio*

54. By the end of 2017, Pepperine continued to feel that the college was not taking seriously her concerns about being targeted, bullied, and harassed by Maio because she is a woman.

55. On or about January 3, 2018, Pepperine submitted a formal complaint to the college about her treatment by Maio, who she accused of targeting her "because I am a woman." She reiterated her allegations against Maio that she had made in her November 15 complaint. *See* **Exhibit R**.

56. President VanWagoner assigned Maryrose Eannace, Vice President for Learning and Academic Affairs, to investigate the complaint.

57. For her investigation, Eannace met separately with Pepperine and Maio, and questioned them about Pepperine's allegations. She also reviewed various written materials.

58. Eannace interviewed Pepperine on January 23, 2018, and interviewed Maio on February 1, 2018.

59. During her interview, Pepperine discussed her complaints about Maio, including her 2016 annual evaluation, the counseling memo she had received relating to the Club Day event, and the office lighting issue.

60. During his interview, Maio admitted that "there is a hostile work environment between them" – and he revealed his hostility and retaliatory animus towards Pepperine when he told Eannace that he "would like something issued to Ms. Pepperine about filing complaints."

61. The record does not show when Eannace reported back to President VanWagoner with her findings and recommendations.

62. On February 26, 2018, Eannace informed Pepperine by letter that "a determination of Not Responsible was recommended to and approved by Dr. VanWagoner." *See* **Exhibit S**.

*Pepperine's Termination*

63. On March 1, 2018 – only three days after Pepperine's complaint about Maio was denied – Maio submitted a memorandum to President VanWagoner "recommend[ing] non-renewal of the grant-funded probationary appointment for Rebecca Pepperine, effective June 30, 2019 [sic]." *See* **Exhibit T**.

64. In support of his recommendation to terminate Pepperine's employment, Maio cited the same three incidents as to which Pepperine had complained about him: His accusation that she had an "abrupt and sometimes abrasive" communication style; the October 2 counseling memo he had issued her relating to the Club Day event; and the oral warning he had issued her in November over the office lighting issue. Nothing else. According to Maio, "[t]his series of events have established that Rebecca is unable to take corrective feedback and unwilling to take reasonable direction from her supervisor." *See* **Exhibit T**.

65. On March 6, 2018, Maio's supervisor, Stephanie Reynolds, submitted a memorandum to President VanWagoner concurring in Maio's recommendation to terminate Pepperine's employment, copying and pasting the reasons given by Maio in his March 1 memorandum. *See* **Exhibit U**.

66. Less than two weeks later, Maio picked another fight with Pepperine over how she responded to an email inquiry, which he escalated to Evans-Dame and Reynolds, and then Reynolds escalated to VanWagoner, who stated on March 19, 2018, that he "fully support[ed] moving to an early non-renewal." *See* **Exhibit V**.

67. While this chain of communications was taking place, Pepperine filed her first EEOC charge on March 15, 2018, alleging sex discrimination and retaliation. *See* **Exhibit A**.

68. The Notice of Charge of Discrimination was stamped received by MVCC Human Resources on March 20, 2018. *See* **Exhibit W**.

69. On March 22, 2018, Pepperine was called to a meeting in HR where Evans-Dame informed her that she was being terminated from her career services position effective immediately, although she would continue to be paid pursuant to her contract through June 30, 2018. She also would be allowed to finish teaching her evening course but for this semester only. Evans-Dame followed up with a letter dated March 26, 2018, memorializing their conversation. *See* **Exhibit X**.

70. On March 22, 2018, Pepperine filed her second EEOC charge, alleging retaliation. *See* **Exhibit B**.

71. In its Determination dated October 13, 2023, with respect to Pepperine's first charge, the EEOC stated, *inter alia*: "Notes from Respondent's internal investigation support Charging Party's allegations of discrimination and Respondent's failure to take effective action. Furthermore, the investigation revealed Respondent fostered an environment of discriminatory terms and conditions and harassment toward female employees, and a pattern and practice of retaliating against women who complain of discrimination and/or harassment, creating a chilling effect that dissuaded other harmed parties from filing complaints. The record indicates Respondent was notified that some people were afraid to report discrimination and harassment because of Respondent's previous actions against those who complained, and Respondent failed to take corrective action." *See* **Exhibit C**.

72. In its Determination dated October 13, 2023, with respect to Pepperine's second charge, the EEOC likewise stated, *inter alia*: "The investigation found Respondent's allegation of insubordination was pretext for retaliation against Charging Party. Furthermore, the investigation revealed Respondent fostered an environment of discriminatory terms and conditions and harassment toward female employees, and a pattern and practice of retaliating against women who complain of discrimination and/or harassment, creating a chilling effect that dissuaded other harmed parties from filing complaints." *See* **Exhibit D**.

73. Pepperine's termination by MVCC has caused and will continue to cause Pepperine to suffer significant financial hardship and mental and emotional distress.

### COUNT ONE: VIOLATION OF TITLE VII (RETALIATION)

74. Plaintiff repeats and incorporates Paragraphs 1-73 above.

75. Plaintiff was a covered employee under Title VII.

76. Defendant was a covered employer under Title VII.

77. Title VII provides, *inter alia*, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter . . . ." 42 U.S.C. § 2000e-3(a).

78. As alleged above, Defendant violated Plaintiff's rights under Title VII by terminating her employment because she opposed unlawful employment practices and/or made a charge under Title VII.

79. Defendant was recklessly indifferent to Plaintiff's federally protected rights.

80. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered pecuniary and non-pecuniary damages, including lost income and benefits and mental and emotional distress, for which she is entitled to an award of back pay, front pay, reinstatement, out of pocket costs, compensatory damages, punitive damages, attorney's fees and costs (including expert witness fees), and appropriate injunctive relief.

### COUNT TWO:  VIOLATION OF STATE HUMAN RIGHTS LAW (RETALIATION)

81. Plaintiff repeats and incorporates Paragraphs 1-80 above.

82. Plaintiff was a covered employee under the New York State Human Rights Law.

83. Defendant was a covered employer under New York State Human Rights Law.

84. The New York State Human Rights Law provides, *inter alia*, that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law  § 296(1)(e).

85. As alleged above, Defendant violated Plaintiff's rights under the New York State Human Rights Law by terminating her employment because she opposed practices forbidden by the statute and/or filed a complaint under the statute.

86. Defendant was recklessly indifferent to Plaintiff's state law rights.

87. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered pecuniary and non-pecuniary damages, including lost income and benefits and mental and emotional distress, for which she is entitled to an award of back pay, front pay, reinstatement, compensatory damages, punitive damages, civil penalties, attorney's fees and costs (including expert witness fees), and appropriate injunctive relief.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury as to all issues triable by jury in the above-captioned civil action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment for Plaintiff and against Defendant on her claims under Title VII and the New York City Human Rights Law, and award her the following relief:

  A. Back pay in an amount to be determined at trial;

  B. Front pay (or reinstatement) in an amount to be determined at trial;

  C. Compensatory damages in an amount to be determined at trial;

  D. Punitive damages in an amount to be determined at trial;

  E. Civil penalties in an amount to be determined at trial;

  F. Appropriate declaratory and injunctive relief;

  G. Pre-judgment and post-judgment interest as allowed by law;

  H. Attorney's fees, costs, and disbursements; and

      I.      Such other relief as law and justice may require.


Dated:    February 7, 2025

                                  Respectfully submitted,

                                /s/ *Steven M. Warshawsky*

By:    _____

                                STEVEN M. WARSHAWSKY
                                The Warshawsky Law Firm
                                *Attorney for Plaintiff*
                                118 North Bedford Road, Suite100
                                Mount Kisco, New York  10549
                                Tel:  (914) 864-3353
                                Email:  smw@warshawskylawfirm.com
                                Website:  www.warshawskylawfirm.com


## **ATTACHED EXHIBITS**

A.    Charge of Discrimination No. 525-2018-00163
B.    Charge of Discrimination No. 525-2018-00715
C.    EEOC Determination Charge No. 00163
D.    EEOC Determination Charge No. 00715
E.    Notice of Right to Sue Within 90 Days
F.    April 2016 Annual Evaluation (Tamburrino)
G.    April 2017 Annual Evaluation (Maio)
H.    September 2017 Email Chain re Club Day event
I.    October 2, 2017 Counseling Memo
J.    October 21, 2017 Evans-Dame Email re October 18 meeting
K.    October 2017 Email Chain re office lighting issue
L.    October 26, 2017 Reynolds Email re office lighting issue
M.    November 2017 Email Chain re office inspection
N.    November 14, 2017 Notice of Charge
O.    December 20, 2017 Disposition – Notice of Charge
P.    November 15, 2017 Pepperine Complaint re HR
Q.    January 9, 2018 Denial Letter re HR Complaint
R.    January 3, 2018 Pepperine Complaint re Maio
S.    February 26, 2018 Denial Letter re Maio Complaint
T.    March 1, 2018 Maio Non-Renewal Recommendation
U.    March 6, 2018 Reynolds Non-Renewal Recommendation
V.    March 2018 Email Chain re early non-renewal
W.    March 20, 2018 Stamped Notice of Charge of Discrimination
X.    March 26, 2018 Termination Letter